# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 22-1499V
Filed: May 1, 2025

|   |   |
|---|---|
| JEANNIE BOSLOUGH,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>     Respondent. | Special Master Horner |

*Courtney Jorgenson*, Siri & Glimstad, LLP, Phoenix, AZ, for petitioner.
*Naseem Kourosh*, U.S. Department of Justice, Washington, DC, for respondent.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On October 12, 2022, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that she suffered a Table Injury of Shoulder Injury Related to Vaccine Administration ("SIRVA") affecting her left shoulder and following an influenza ("flu") vaccination she received on October 26, 2020. (ECF No. 1; *see also* ECF No. 17 (amended petition).) On December 2, 2024, petitioner moved for a finding of fact that she suffered residual effects of her injury for at least six months, a threshold statutory requirement under the Vaccine Act. (ECF No. 47.) For the reasons set forth below, I conclude that petitioner has demonstrated by preponderant evidence that she suffered her alleged injury for greater than six months following the vaccination at issue.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

**I.     Procedural History**

Based on the allegations in the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU"), which is intended to expedite cases having a high likelihood of informal resolution.  (ECF Nos. 16, 19.)  Between November of 2022 and February of 2024, petitioner filed written statements by herself (Exs.1,12) and her husband, James Boslough, M.D. (Exs. 7, 13), as well as medical records (Exs. 2-6, 8-11).

Respondent filed his Rule 4(c) Report in February of 2024.  (ECF No. 33.)  In pertinent part, respondent contended that petitioner had not preponderantly demonstrated that her shoulder injury persisted for at least six months as required by the Vaccine Act.  (*Id.* at 12-16.)  Respondent argued that petitioner's medical records showed a resolution of her post-flu vaccine shoulder pain by February of 2021 (about 4 months post-vaccination) and attributed later reports of shoulder pain beginning in August of 2021 to a Covid-19 vaccination petitioner received in the interim.  (*Id.*)  Respondent also disagreed that petitioner's medical records demonstrate either a Table SIRVA or a shoulder injury caused-in-fact by vaccination.  (*Id.* at 16-20.)

Petitioner filed a further written statement by her husband with attachments as well as additional medical records.  (Exs. 15-17.)  However, in October of 2024, the Chief Special Master reassigned the case out of the SPU and to the undersigned because respondent advised he would continue defending the case.  (ECF Nos. 43-44.)  Shortly thereafter, I held a status conference with the parties during which it was determined that a fact finding as to the statutory severity requirement was an appropriate next step.  (ECF No. 45.)  During the conference, I advised the parties that I had reviewed a news article with respect to the mass vaccination site at which petitioner describing receiving her Covid-19 vaccination.  (*Id.* at 2.)  That news article was filed as Court Exhibit I.  (*Id.*)

On November 3, 2024, respondent filed a status report requesting that petitioner file outstanding medical records.  (ECF No. 46.)  In a Scheduling Order that directed petitioner to file those outstanding medical records, the undersigned noted that based on his review of respondent's request, "the outstanding medical records are not necessary to the parties' briefing for a finding of fact as directed by the order at ECF No. 45 and no change to the existing briefing schedule is necessary."  (Non-PDF Scheduling Order, issued Nov. 12, 2024.)  Petitioner filed a motion for a finding of fact on December 2, 2024.  (ECF No. 47).  Respondent filed his response on January 6, 2025.  (ECF No. 55.)  And petitioner filed a reply on February 20, 2025.  (ECF No. 62.)  Petitioner also subsequently filed further medical records, as requested by respondent.  (ECF Nos. 60, 65; Exs. 18-22.)  Although respondent felt these records could potentially

be relevant to the instant fact finding (ECF No. 46), I have reviewed these records and determined that they are not informative of the specific factual question at issue.[3]

In light of the above, I have determined that the parties have had a full and fair opportunity to develop the record with respect to the statutory severity requirement and that it is appropriate to render this finding of fact on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

## II. Summary of Record Evidence

### a. Medical Records[4]

Petitioner asserts that her medical history prior to the vaccination at issue did not include any history of left shoulder issues. (ECF No. 47, p. 1 (citing Exs. 1, 7).) Respondent does not dispute this assertion but does make a point of noting the several times that petitioner and her husband contacted her primary care physician ("PCP") for various purposes in the months prior to the vaccination at issue. (ECF No. 55, p. 2 (citing Ex. 6, p. 192 (February 11, 2020 message requesting a mammogram); *Id.* at 182 (March 8, 2020 message requesting a prescription refill); *Id.* at 171-72 (July 24, 2020 message requesting lab work); *Id.* at 167-70 (August 11, 2020 phone call regarding "paperwork"); *Id.* at 163-66 (September 23, 2020 phone call regarding paperwork pertaining to diabetes medication)).). Petitioner received the flu vaccination at issue in her left deltoid on October 26, 2020. (Ex. 5, pp. 2-3; Ex. 6, p. 4.)

Petitioner subsequently presented to an orthopedist Stephen Yemm, M.D., on February 10, 2021, with a chief complaint of left arm pain, which she reported experiencing "ever since" her receiving flu vaccination in October of 2020. (Ex. 3, p. 11.) She complained of pain, tenderness, and difficulty moving her shoulder and left arm generally. (*Id.*) While petitioner tried massage and applying heat, she reported that these at-home treatments aggravated her symptoms rather than providing pain relief. (*Id.*) Physical exam revealed tenderness to palpation at the mid humerus, but no loss of motion in the shoulder and no impingement signs. (*Id.*) X-rays were normal. (*Id.*) Petitioner was assessed as having "[p]robable post-vaccination traumatic symptoms" and continued symptomatic treatments were recommended. (*Id.*)

---

[3] The later filed records pertain to treatment and monitoring of unrelated conditions and mostly occurring during periods either before or after the period placed at issue herein. Petitioner did consult her oncologist by e-mail in May of 2021 regarding potential risks of her anticipated Covid vaccination (Ex. 19, p. 65); however, this was for specific concerns unrelated to her alleged shoulder pain.

[4] Although the medical records have been reviewed and considered in their entirety, only those necessary to evaluating the specific question of whether petitioner's alleged post-vaccination symptoms persisted for at least six months are discussed.

Petitioner did not return to the orthopedist until over six months later, on August 31, 2021. (Ex. 3, p. 8.) In the interim, respondent stresses that she contacted her PCP on several occasions without mentioning any shoulder pain. (ECF No. 55, pp. 3-4.)

On March 16, 2021, petitioner sent a message to her primary care office to request a referral to a female surgeon to address hemorrhoids. (Ex. 6, p. 162.) The PCP initially set up an appointment for March 30, 2021; however, petitioner responded by explaining that her husband had already assessed the condition and that she preferred to skip straight to the referral. (*Id.* at 159-60.) The PCP determined the referral request could be discussed at the March 30 appointment (*Id.* at 159), but there is no indication in the records that the encounter occurred. Instead, petitioner's referral was not placed until December 10, 2021, when she later presented for an annual exam. (*Id.* at 125-27, 138, 142-47.)

On May 4, 2021, petitioner sent a message to her primary care office to request refills on some of her prescriptions. (Ex. 6, p. 157.) The office was concerned regarding the length of time since petitioner had been seen in the office, but her PCP authorized the medication refills based on her virtual encounter in December of 2020, though petitioner was encouraged to schedule a mammogram. (*Id.* at 155-57.)

Petitioner also received a Covid-19 vaccination on May 8, 2021. (Ex. 6, p. 4, 133.) Petitioner received the vaccination at "THE RANCH CVS." (*Id.* at 4.) "The Ranch" was a mass vaccination site supported by the Federal Emergency Management Agency ("FEMA"). (Ct. Ex. I.) Petitioner's PCP records indicate that she received the vaccination in her left arm; however, this information was not entered into her chart contemporaneously. (Ex. 6, pp. 4, 133 (noting immunizations reviewed/edited on 12/10/2021).) Petitioner's CDC Covid-19 Vaccination Record Card does not indicate the site of administration. (Ex. 11, p. 1.)

When petitioner returned to her orthopedist on August 31, 2021, this time seeing Brian Lancaster, M.D., she completed a handwritten intake form on which she indicated that she was experiencing issues pertaining to range of motion and muscle pain in her left humerus that began in October of 2020 "after flu shot." (Ex. 3, p. 10.) Dr. Lancaster further recorded the following history:

> The patient is a 71-year-old female previously seen by Dr. Yemm. She has had pain in the left arm and shoulder. This started in October of 2020. It came on after a flu shot. Pain is at the distal aspect of her deltoid, near the insertion site. She has not noted any swelling. It has been present since about the time of injection. It is in the same spot she received the injection. She has noted gradual loss of range of motion since last seen by Dr. Yemm. She has treated with ibuprofen. She does not use any other medications, has not done anything else specifically for it otherwise. She denies radiating pain, numbness or tingling.

(*Id.* at 8.)

At this encounter, physical exam did show reduced range of motion and signs of impingement in the left shoulder. (Ex. 3, p. 8.) Dr. Lancaster was concerned that petitioner had developed adhesive capsulitis following the initial onset of her post-vaccination shoulder pain in October of 2020. (*Id.*) A cortisone injection was administered with a recommendation to get an MRI if her condition did not improve. (*Id.* at 8-9.)

Petitioner again waited about six months to return for further orthopedic care. (Ex. 3, p. 5.) She saw the orthopedist again on March 1, 2022. (*Id.*) Respondent stresses that in the interim petitioner sought medication refills from her PCP in October of 2021 and had an annual exam in December of 2021 without mentioning her shoulder pain. (ECF No. 55, pp. 4-5 (citing Ex. 6, pp. 124-28, 142-46, 151-54).) In particular, he stresses that her self-assessment at the annual exam was that she was "good." (*Id.* at 5 (citing Ex. 6, p. 126).) Petitioner received her second Covid-19 vaccination on December 16, 2021, which is documented as having been administered in her right shoulder. (Ex. 5, pp. 31-32; Ex. 11, p. 2.)

When petitioner returned to the orthopedist for a follow up with Dr. Lancaster on March 1, 2022, she reported that the steroid injection administered in August of 2021 had "worked tremendously," but that the pain and returned and was now severe. (Ex. 3, p. 5.) In a later encounter, petitioner would specify she experienced about six weeks of pain relief from the steroid injection. (*Id.* at 2.) On physical exam, petitioner had reduced range of motion and signs of impingement, which Dr. Lancaster felt were consistent with ongoing adhesive capsulitis. (*Id.*) He recommended an MRI, which petitioner underwent on March 8, 2022. (*Id.* at 5, 14.) The MRI showed adhesive capsulitis; a chronic superior labrum anterior to posterior ("SLAP") tear; moderate to severe acromioclavicular joint arthritis; mild subacromial subdeltoid bursitis; and mild glenohumeral joint chondromalacia with small effusion and debris and a moderate tendinosis of the long head of the biceps tendon. (*Id.* at 14.)

Shortly thereafter, petitioner contacted her PCP seeking an alternative referral (other than orthopedics) for her shoulder pain, but her PCP recommended she continue seeking an orthopedist. (Ex. 6, p. 120.) However, petitioner renewed her request on April 27, 2022, and the PCP referred her to a pain management specialist. (*Id.* at 114-15.) She saw the pain management specialist on May 31, 2022, reporting the same post-vaccination history she provided to her orthopedists, and he assessed upper arm pain, shoulder capsulitis, chronic pain syndrome, and diabetes. (Ex. 17, pp. 24-25.) Petitioner wished to try plasma rich platelet ("PRP") injections. (*Id.* at 27.)

Petitioner saw a third orthopedist, Sean Grey, M.D., on May 31, 2022. (Ex. 3, p. 2.) She reported the same history of pain beginning in October of 2020 following her flu vaccination. (*Id.*) Dr. Grey noted that petitioner had a "very interesting story" insofar as she had ongoing complaints relating to the mid-humerus that were nonetheless alleviated by her subacromial steroid injection. (*Id.* at 3.) He assessed a "potential soft tissue injury mid humerus (status post flu shot)" along with calcific tendinitis and

adhesive capsulitis and ordered an MRI of the mid humerus. (*Id.*) Petitioner underwent this MRI on June 8, 2022, and it was unremarkable. (*Id.* at 13.) Petitioner returned to Dr. Grey on November 29, 2022. (Ex. 8, p. 11.) In light of the findings of the June 8, 2022 MRI, Dr. Grey felt that petitioner's main pain generators were her calcific lesion and her acromioclavicular arthritis for which he recommended surgery. (*Id.*)

Additional medical records are in evidence and petitioner did continue to treat her shoulder condition; however, the remaining medical records are not informative of the specific factual question presently at issue. Ultimately, petitioner underwent left shoulder surgery on February 22, 2023. (Ex. 8, pp. 14-16.) The post-operative diagnoses were calcific tendinitis, acromioclavicular joint arthralgia, glenohumeral joint osteoarthritis, and a displaced biceps tendon tear. (*Id.* at 14.)

  b. <u>Written Statements</u>

Petitioner filed two written statements. (Exs. 1, 12.) In her first statement, petitioner described receiving her flu shot in her left shoulder at Walgreen's pharmacy in October of 2020. (Ex. 1, ¶ 4.) She felt pain at the injection site immediately, but initially thought it was normal post-vaccination pain. (*Id.*) However, it persisted over the ensuing months. (*Id.*) She confirmed that she first sought treatment for this pain with Dr. Yemm in 2021, and he advised that "[h]e hoped that my pain would dissipate within the year." (*Id.* ¶ 6.) Thereafter, she tried "medications, massage, heat, cold, moving my arm around, to no avail." (*Id.* ¶ 7.) She indicated that she developed reduced range of motion. (*Id.*) She returned for further treatment in August of 2021. (*Id.* ¶ 8.) She indicated that the steroid injection she received at that encounter initially improved her symptoms, but they returned "several months later." (*Id.*)

Petitioner's first statement notes that her December 2021 Covid-19 vaccination was administered in her right shoulder but does not discuss her May 2021 vaccination. (Ex. 1, ¶ 3.) Her second statement explained that she received a Covid-19 vaccination on May 8, 2021, at a drive-thru vaccination event held at the Budweiser Event Center in Loveland, Colorado, known as "The Ranch." (Ex. 12, ¶¶ 2-3.) Because her husband drove and she was in the passenger seat, she recalled receiving her vaccination in her right shoulder. (*Id.* ¶ 3.) Petitioner further recalled that she would have wanted the vaccination in her right, rather than left, shoulder anyway, due to her experience with her prior flu vaccination. (*Id.* ¶ 4.) Court Exhibit I confirms petitioner's recollection that "The Ranch" was a "drive-thru" vaccination site. (Ct. Ex. I, p. 2.)

Petitioner's husband, James Boslough, provided three written statements. (Exs. 7, 13, 15.) In his first statement, Dr. Boslough explained that he is a board-certified emergency physician. (Ex. 7, ¶ 1.) Accordingly, he indicated that he advised petitioner regarding her post-vaccination shoulder pain, guiding her through home treatment with over-the-counter pain and anti-inflammatory medications, heat and ice treatments, and some massage and physical therapy treatments. (*Id.* ¶¶ 5-9.) Because he felt petitioner was making "some progress" with the treatments he recommended, and because it was unwise to seek non-urgent medical care during the Covid-19 pandemic,

6

Dr. Boslough counseled petitioner to continue at-home treatment until it became clear the pain would not resolve with conservative care, at which point she saw Dr. Yemm. (*Id.* ¶¶ 10-12.)  However, Dr. Yemm recommended continuing the same modalities petitioner was already using, hoping the pain would resolve within a year.  (*Id.* ¶ 12.)

In his second statement, Dr. Boslough recalled that he drove the couple to "The Ranch" to receive their Covid-19 vaccinations on May 8, 2021.  (Ex. 13, ¶ 1.) Accordingly, he observed that she received the vaccination in her right shoulder, through the vehicle's passenger window.  (*Id.* ¶ 2.)  In his third statement, Dr. Boslough explained that he contacted both Larimer County and FEMA in an effort to have petitioner's injection site information corrected.  (Ex. 15, ¶¶ 6-8.)  However, he was unable to resolve the issue.  (*Id.* ¶ 9*.)*

### III.     Legal Standard

In order to state a claim for a vaccine-related injury under the Vaccine Act, a vaccinee must have either:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention*.*

§ 300aa-11(c)(1)(D).  In this case, only the first of these conditions is potentially met.

Neither "residual effects" nor "complication" is defined within the Vaccine Act itself.  *See* § 300aa-33.  However, in *Wright v. Secretary of Health & Human Services*, the Federal Circuit described these terms as follows: "'Residual' suggests something remaining or left behind from a vaccine injury.  An effect that is 'residual' or 'left behind' is one that never goes away or that recurs after the original illness."  22 F.4th 999, 1005 (Fed. Cir. 2022) (internal citation omitted).  A "complication," however, is "[a] morbid process or event occurring during a disease which is not an essential part of the disease, although it may result from it."  *Id.* at 1006 (alteration in original) (citation omitted).  "Read together, 'residual effects' and 'complications' appear to both refer to conditions within the patient, with 'residual effects' focused on lingering signs, symptoms, or sequalae characteristic of the course of the original vaccine injury, and 'complications' encompassing conditions that may not be 'essential part[s] of the disease' or may be outside the ordinary progression of the vaccine injury."  *Id.* (alteration in original).

Because the complication or residual effect must be "of such illness, disability, injury, or condition," the traditional tort concepts of causation apply, and the vaccine injury must be both a but-for cause and substantial contributing factor to the complication or residual effects at issue.  *Wright*, 22 F.4th at 1004-05.  The Vaccine Act prohibits a special master from ruling for petitioner based solely on his allegations

7

unsubstantiated by medical records or medical opinion. § 300aa-13(a)(1). However, "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record evidence as a whole and the totality of the case,'" whether causation has been demonstrated. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (quoting *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)). Special masters are not bound by the reports, summaries, or conclusions contained in the medical records. § 300aa-13(b)(1). Rather, the special master must consider the entire record. *Id.*

A petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim. *See* § 300aa-13(a)(1)(A). However, not every element of petitioner's claim needs to be specifically supported by medical records or opinion. For example, onset of an injury may be determined to be consistent with the Vaccine Injury Table even when the first symptom or manifestation "was not recorded or was incorrectly recorded as having occurred outside such period." § 300aa-13(b)(2). The fact of a vaccination also need not itself be proven by medical records or medical opinion. *See, e.g.*, *Wonish v. Sec'y of Health & Human Servs.*, No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991) (stating, with regard to § 300aa-13(a)(1), that "[i]t seems obvious then that not all elements must be established by medical evidence" and that "[v]accination is an event that in ordinary litigation could be established by lay testimony" as "[m]edical expertise is not typically required"); *Centmehaiey v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 612, 621 (1995) (noting that the "lack of contemporaneous, documentary proof of vaccination, however, does not necessarily bar recovery"), *aff'd*, 73 F.3d 381 (Fed. Cir. 1995). The Federal Circuit has also observed, albeit in the context of attorneys' fees and costs, that "[w]hile lay opinions as to causation or medical diagnosis may be properly characterized as mere 'subjective belief' when the witness is not competent to testify on those subjects, the same is not true for sworn testimony as to facts within the witness's personal knowledge, such as the receipt of a vaccine and the timing and severity of symptoms." *James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021).

However, medical records do ordinarily "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). Thus, where subsequent testimony conflicts with contemporaneous medical records, special masters frequently accord more weight to the medical records. *See, e.g.*, *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993) ("[W]ritten documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later."); *see also Vergara v. Sec'y of Health & Human Servs.*, No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony.").

Special masters are cautioned against favoring contemporaneous records "reflexively" and must not overemphasize individual records at the expense of a

comprehensive evaluation of the entire record. *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 539-41 (2011). "[M]edical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). Moreover, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992).

There are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) (explaining that, "like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy*, 23 Cl. Ct. at 733)). However, when witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In *Kirby v. Secretary of Health & Human Services*, the Federal Circuit confirmed that it is not an error for a special master to find the severity requirement met where that finding is based on a collection of "plausible evidence." 997 F.3d 1378, 1381 (Fed. Cir. 2021). In that case, petitioner's medical records reflected active treatment of her condition for only a few months before she was released as having reached maximum medical improvement, though not entirely symptom free. *Id.* at 1379-80. Thereafter, the medical records were silent as to her alleged residual effects for the remaining duration of the six-month post-vaccination period. *Id.* at 1380. However, petitioner testified that she continued a home exercise plan for more than a year. *Id.* at 1381. Her testimony was corroborated by documentation in the form of her retained home exercise instruction sheets, a more remote return visit where the relevant symptoms were again reported, and an expert opinion confirming her reported symptoms were consistent with her injury. *Id.* The Federal Circuit concluded that where the medical records are silent, rather than contradictory, it was not error for the special master to credit the petitioner's corroborated testimony as evidence satisfying the six-month severity requirement. *Id.* at 1383-84.

### IV.     Party Contentions[5]

In her motion, petitioner asserts that she has preponderantly demonstrated that her shoulder pain persisted for at least six months as required by § 300aa-11(c)(1)(D), stressing in particular that her August 31, 2021 orthopedic treatment encounter with Dr. Lancaster occurred after the six-month mark. (ECF No. 47, pp. 14-16.) Petitioner asserts that this record establishes that her pain began at the time of her October 26, 2020 vaccination and persisted since that time. (*Id.* at 15-16.) Petitioner disputes that her May 8, 2021 Covid-19 vaccination constitutes any alternative explanation for the pain addressed at her August 31, 2021 encounter, because she received that vaccination in the opposite shoulder. (*Id.* at 16.) She further argues that, in any event, the fact of the May 8, 2021 vaccination, even if it were in the same shoulder, would not be evidence that petitioner's shoulder pain resolved prior to April 26, 2021, the six-month mark. (*Id.*)

Respondent argues that "there is a conspicuous lack of reporting or treatment for shoulder pain between February 10, 2021, three and a half months after vaccination, and August 31, 2021, more than ten months after vaccination." (ECF No. 55, p. 13.) Respondent contrasts this with what he views as petitioner's "established pattern" of frequently contacting her PCP regarding a range of issues, citing numerous instances of such contact. (*Id.* at 13-15.) Respondent stresses that this pattern of contact does include instances from March, April, and May of 2022, that pertained to her shoulder pain. (*Id.* at 15.) Thus, respondent argues that "[l]ogic dictates that, if petitioner had been experiencing shoulder symptoms during this time, she would have reported it, as she did for her other complaints." (*Id.*) Because respondent interprets petitioner's medical records as lacking any documentation of shoulder symptoms between February and August of 2021, he contends that petitioner's written statements are in conflict with her medical records and therefore entitled to less weight. (*Id.*) According to respondent, while petitioner "now summarily alleges that she continued to experience shoulder pain 'unabated' for two years after her October 26, 2020 flu vaccination," her statements are "vague and unsupported testimonial statement[s], made retrospectively in the context of litigation." (*Id.*)

Respondent considers the gap in treatment from February to August of 2021 to be "lengthy." (ECF No. 55, p. 17.) Furthermore, he stresses that this gap in treatment is not explained by a steroid treatment. (*Id.*) He also asserts that it cannot be explained

---

[5] Although the parties were directed to brief the question of the statutory severity requirement (ECF No. 45), petitioner's motion also includes a section stressing that onset of her condition arose on the day of vaccination. (ECF No. 47, pp. 13-14.) However, petitioner stops short of requesting any finding of fact as to onset. (*Id.*) Further, respondent specifically noted that he was not addressing the question of onset in light of the undersigned's prior order. (ECF No. 55, p. 19 n.4 (citing ECF No. 45).) Accordingly, this finding of fact does not reach the question of onset. Also of note, petitioner's motion references observations made by the Chief Special Master in a scheduling order issued on July 17, 2024. (ECF 47, pp. 14, 16 (citing ECF No. 34).) However, respondent stresses that these observations were made merely in the context of a scheduling order and are therefore not binding on the undersigned. (ECF No. 55, p. 16.) Respondent is correct and the guidance provided by the Chief Special Master's July 17, 2024 order has no bearing on the outcome of this fact finding.

10

by caution relating to Covid-19, because petitioner had already taken the step of going in for treatment in February of 2021.  (*Id.* at 15 n.2.)  Respondent further argues that Dr. Boslough's status as a physician does not help explain petitioner's pattern of care.  (*Id.* at 15-17.)  Although he acknowledges that the medical records show Dr. Boslough was generally involved in petitioner's medical care, he suggests that this stands as a contrast to her shoulder pain.  (*Id.* at 16-17.)  There is a lack of evidence that he was involved in helping to manage care of her shoulder.  (*Id.*)  Thus, respondent argues that there is no apparent explanation for petitioner's gap in treatment.  (*Id.* at 17.)  Respondent argues that it is petitioner's, rather than respondent's, burden to establish what happened between February and August of 2021 and that finding in petitioner's favor "would not only require speculation, but would also require ignoring existing evidence."  (*Id.* at 18.)

Respondent notes that he initially contended that petitioner's PCP records indicated she had received a Covid-19 vaccination in her left shoulder in May of 2021, which he had argued was significant to assessing the source of the shoulder pain reported in petitioner's August of 2021 and later medical records.  (*Id.* at 19 (citing ECF No. 33, pp. 14-15).)  However, in his motion response, respondent stresses that a finding that petitioner's Covid-19 vaccination was administered in her right, rather than left, arm, would "not cure the evidentiary defects identified above or satisfy petitioner's burden to preponderantly prove with independent evidence that her alleged vaccine injury persisted beyond April 26, 2021, six months after her October 26, 2020 flu vaccination."  (*Id.*)

In reply, petitioner argues that respondent's logic is flawed for two reasons.  (ECF No. 62, pp. 2-4.)  First, petitioner did report her shoulder pain at her February 10, 2021 encounter with Dr. Yemm and her subsequent pattern of care is explained by his recommendation from that encounter.  (*Id.* at 2.)  Second, petitioner's ability to access advice from her physician-husband additionally helps explain her continued at-home treatment.  (*Id.* at 2, 4.)  Petitioner further argues that, given her age, it is reasonable that she would exercise a high level of caution with respect to potentially contracting Covid-19.  (*Id.* at 4.)  To the extent respondent perceives a discrepancy between the testimony and the contemporaneous medical records, "clear, cogent, and consistent" testimony can explain such discrepancies, especially where the medical records are merely silent.  (*Id.* at 3 (citing *Stevens v. Sec'y of Health & Human Servs.*, No. 90-221V, 1990 WL 608693, at *3 (Fed. Cl. Spec. Mstr. Dec. 21, 1990).)

## V.     Discussion

The sole question at issue on this motion is whether petitioner has preponderantly demonstrated that the shoulder pain representative of her alleged SIRVA persisted for at least six months, as required by Section 11 of the Vaccine Act, *i.e.* until at least April 26, 2021.  Respondent is of course correct that petitioner bears the burden of proof on this point and that contemporaneous treatment records are often afforded greater weight than conflicting testimonial evidence.  *Cucuras*, 993 F.2d at 1528.  However, he is incorrect to assert that only petitioner's statements made for

11

litigation support her allegation of unabated shoulder pain.  (ECF No. 55, p. 15.)  Respondent argues that petitioner's contemporaneous medical records constitute evidence of a lack of shoulder symptoms between February and August of 2021 (*Id.*); however, he reaches this conclusion only via a selective interpretation of the records.

When petitioner presented to Dr. Lancaster on August 31, 2021, she filled out an intake form on which she reported the onset of her condition as "Oct. 2020" and "[a]fter flu shot."  (Ex. 3, p. 10.)  Thus, Dr. Lancaster was explicit in treating petitioner on the basis that he was addressing a continuation of shoulder pain that had previously been treated by Dr. Yemm in February of 2021.  (*Id.* at 8 (explaining that "The patient is a 71-year-old female previously seen by Dr. Yemm.  She has had pain in the left arm and shoulder.  This started in October 2020 . . . She has noted gradual loss of range of motion since last seen by Dr. Yemm").)  In particular, he assessed "Left shoulder pain concerning for adhesive capsulitis, onset of October 2020, likely following a flu shot." (*Id.*)  Especially because Dr. Lancaster engaged with this history and incorporated it into his assessment, it is entitled to significant weight.  *Accord Curcuas*, 993 F.2d at 1528 (explaining that medical records generally constitute trustworthy evidence because "[w]ith proper treatment hanging in the balance, accuracy has an extra premium.")  Although respondent repeatedly raises the fact that this encounter with Dr. Lancaster marked the end of a gap in medical treatment, he entirely fails to grapple with the substance of the encounter.  (ECF No. 55, pp. 13-19.)

Instead, respondent stresses both that petitioner's preceding gap in treatment was "lengthy" and that she contacted her primary care provider about other issues in the interim.  (ECF No. 55, pp. 13-15, 17.)  Respondent suggests that this pattern lacks any apparent explanation.  (*Id.* at 17.)   He further argues that, as a matter of logic, petitioner's medical records from February to April of 2021 must be treated as some evidence that petitioner was *not* experiencing shoulder pain during this period.  (*Id.* at 15.)  Again, however, respondent fails to grapple with the actual substance of petitioner's orthopedic treatment records.  When petitioner was seen by Dr. Yemm on February 10, 2021, the visit immediately preceding her gap in treatment, he documented his treatment plan as follows: "I reassured regarding findings today.  I recommended continued symptomatic measures, avoiding massage considering treating with heat, topical Voltaren gel and she will follow up on a p.r.n.[6] basis over time." (Ex. 3, p. 11.)  The fact that Dr. Yemm specifically directed petitioner to continue her at-home treatments is sufficient to explain petitioner's pattern of conduct over the ensuing months.  The fact that petitioner was otherwise diligent in raising different concerns with her PCP is immaterial where the medical treatment records show that petitioner had an operative treatment plan in place for her shoulder pain.  Although Dr. Yemm did suggest the possibility of follow up "p.r.n." "over time" the record does not suggest that any near-term follow up was indicated.  Dr. Yemm reported that he had

---

[6] "p.r.n." means "pro re nata," which is Latin for according to the circumstances and in medical terminology generally means "as needed." NEIL M. DAVIS, MEDICAL ABBREVIATIONS: 55,000 CONVENIENCES AT THE EXPENSE OF COMMUNICATION AND SAFETY, 486 (16th ed. 2020); *see also P.R.N.*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=40973 (last visited Apr. 18, 2025); *Pro re nata*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=41285 (last visited Apr. 18, 2025).

"reassured" petitioner regarding his findings and his primary recommendation was to continue symptomatic treatment using over-the-counter modalities. (*Id.*)  This is directly analogous to *Kirby*.  997 F.3d at 1379-84.

In *Kirby*, the Federal Circuit found that it was appropriate for the special master to consider, *inter alia*, the fact that petitioner had been advised by her physician that she had reached maximum medical improvement as explanation for the silence of her medical records with respect to any ongoing symptoms. 997 F.3d at 1383.  Afterall, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Id.* (quoting Murphy, 23 Cl. Ct. at 733).)  Indeed, while both petitioner and Dr. Boslough recalled that Dr. Yemm suggested that petitioner continue symptomatic treatment for the remainder of 2021 (Ex. 1, ¶ 6; Ex. 7, ¶ 12), petitioner ultimately resumed treatment much sooner when she returned to Dr. Lancaster in August of 2021.  (Ex. 3, p. 8.)  In the context of Dr. Yemm's recommendation, this earlier than expected return to care in itself tends to suggest that petitioner's pain never resolved.  As was the case in *Kirby*, the fact that petitioner contacted her PCP during the same period for unrelated reasons (in this case to request prescription refills and a referral for an unrelated condition (*see* ECF No. 55, pp. 13-14 (citing Ex. 6, pp. 157-62))) does not suggest otherwise.

To the extent respondent simply finds it suspicious that petitioner waited over six months to follow up with Dr. Lancaster, this does not itself indicate the witness statements are in conflict with the medical records.  *Accord Kirby*, 997 F. 3d at 1383 (explaining that in the absence of a presumption that medical records are complete, a reasonable fact finder could find no conflict between the petitioner's testimony and the silence of the medical records regarding any lingering symptoms).  The witness statements suggest several reasonable considerations that influenced petitioner's pattern of care, including Dr. Boslough's ability as a licensed physician to provide advice at home, Dr. Yemm's treatment plan that likewise recommended symptomatic treatment only, and the ongoing Covid-19 pandemic.  Nothing in the medical records, apart from mere silence, offers any reason to doubt these explanations.  Respondent suggests that the fact that petitioner saw Dr. Yemm on February 10, 2021, disproves that she was concerned about the Covid-19 pandemic (ECF No. 55, p. 15 n.2), but this is not persuasive.  Petitioner need not have been entirely homebound to have had a legitimate interest in minimizing her ongoing risk of exposure at subsequent medical office visits.  Notably, the vast majority of instances of doctor-patient contact cited by respondent are merely e-mail messages and telephone communications rather than office visits.  (*Id.* at 13-15.)  Given that the medical records are simply silent regarding either the presence of symptoms between February and August of 2021 or the reasons petitioner delayed returning for further treatment, there is no reason not to credit the written statements by petitioner and her husband with respect to their rationale at the time.

Had petitioner received her Covid-19 vaccination in the same shoulder during her gap in treatment, this might have complicated the picture if one assumes most individuals would not willingly be vaccinated in a shoulder suffering an active vaccine injury.  However, I am not persuaded that a left shoulder administration of petitioner's

13

May 8, 2021 Covid-19 vaccination is preponderantly supported. Petitioner's CDC Covid-19 Vaccination Record Card does not indicate the site of administration. (Ex. 11, p. 1.) Petitioner's PCP's office recorded a left-side injection (Ex. 6, p. 133); however, this record was not created contemporaneously and petitioner's PCP was not involved in administering the vaccination. Moreover, given that petitioner was vaccinated at a drive-thru vaccination site, and given that her contemporaneous administration record is silent rather than to the contrary, her recollection that she was vaccinated in her right arm because she was seated in the passenger seat is reasonable and creditable. (Exs. 12-13; Ct. Ex. I.)

### VI.     Conclusion

Contrary to respondent's view, petitioner's written statements are not in conflict with the contemporaneous medical records. But, in any event, the medical records alone are sufficient to meet petitioner's burden of proof for the reasons discussed above. In particular, respondent entirely ignores the fact that petitioner's gap in treatment from February to August of 2021 is consistent with her physician's recommendation for symptomatic treatment and that her later treatment record explicitly confirms upon follow up that her symptoms persisted despite that gap in treatment.

For all the reasons discussed above, there is preponderant evidence that petitioner's alleged post-vaccination shoulder pain persisted for at least six months following the October 26, 2020 flu vaccination at issue. Therefore, there is preponderant evidence that petitioner has satisfied the statutory severity requirement under § 300aa-11(c)(1)(D) that is prerequisite to demonstration of a compensable injury.

A separate order will issue setting forth further scheduling in the case.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master
